IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DNC PARKS & RESORTS AT YOSEMITE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-1034 |
| | ) | (Judge Campbell-Smith) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YOSEMITE HOSPITALITY, LLC | ) | |
| | ) | |
| Third party defendant. | ) | |

DEFENDANT'S AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT

For its answer to plaintiff's first amended complaint, defendant admits, denies, and alleges as follows:

1.      The allegations in paragraph 1 are plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

2.      The allegations in paragraph 2 are plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

3.      The allegations in paragraph 3 are plaintiff's characterizations regarding itself, to which no response is required.

4.       Admits.

5.      The allegations in paragraph 5 are conclusions of law, to which no response is required.

6.      Admits.

7.      Admits.

8.      Admits all allegations, with the exception of plaintiff's allegation that plaintiff, DNC Parks & Resorts at Yosemite, Inc. (DNCY), operates 1,542 guest rooms, 28 food and beverage units, and 19 retail locations.  Defendant avers that DNCY currently operates 1,564 guest rooms, 27 food and beverage units, and 23 retail locations.

9.      Admits.

10.     Admits that *some* visitor services have been provided by the Yosemite Park & Curry Company and its predecessors in interest (YP&CC) but denies the implication that *all* visitor services have been provided by YP&CC.

11.     Defendant lacks sufficient information to admit or deny the allegations. Defendant avers that YP&CC voluntarily entered into a merger agreement with the National Park Foundation (NPF).

12.     Admits that YP&CC or its predecessor entities built The Ahwahnee, Yosemite Lodge, and Curry Village.  The second sentence consists of legal conclusions, to which no response is required.

13.     Admits that YP&CC registered trademarks, servicemarks, and logos in connection with its operations including the Half-Dome logo, "The Ahwahnee" hotel name, and "Bracebridge Dinner."  Defendant does not have sufficient information to admit or deny whether YP&CC developed and used unregistered trademarks, servicemarks or logos or whether it registered "The Ahwahnee" logo design.  Defendant denies that YP&CC registered "Go Climb A Rock."  Defendant further avers that "Go Climb a Rock" was registered by MCA, Inc.

14.     Defendant neither affirms nor denies, as YP&CC's concession contract speaks for itself.  Defendant further avers that, despite the language of YP&CC's concession contract, the Statement of Requirements issued by the National Park Service (NPS) in 1992 for CC-

YOSE004-93, required that the successful bidder acquire all of YP&CC's stock, not purchase assets under the prior concession contract.  Defendant denies that this obligation was linked to the obligations of the Secretary of the Department of the Interior (Secretary) to require YP&CC's successor to purchase YP&CC's "other property" and pay the "fair value" thereof.

15.     Defendant denies that YP&CC relinquished its possessory interest in concessioner improvements during the term of its contract.  Defendant avers that YP&CC relinquished its possessory interest when the merger agreement closed.  Defendant further avers that plaintiff's concession contract CC-YOSE004-93 (DNCY's Concession Contract) states that plaintiff waives and relinquishes any possessory interest rights in YP&CC's former possessory interest improvements.  Moreover, defendant denies that "other property" remained to be purchased under the YP&CC contract, as the transition was structured as a merger.

16.     Denies.  Defendant avers that the Statement of Requirements issued by NPS in 1992 for CC-YOSE004-93 required that the successful bidder acquire all of YP&CC's stock for a pre-determined price of approximately $61.5 million.  Denies that this obligation was linked to the obligations of the Secretary to require YP&CC's successor to purchase YP&CC's "other property."  Further, defendant denies plaintiff's allegation that, pursuant to the Statement of Requirements, the successful bidder would be required to purchase YP&CC's "remaining assets."  Instead, defendant avers that the Statement of Requirements provided for the sale to the successful bidder of YP&CC's *stock* through a merger and not, as a distinct matter, its "remaining assets."  Defendant avers that a merger requires the surviving entity to assume all of the assets and liabilities of the original merger entity, so contract and environmental liabilities would become an obligation of the surviving entity.

17.     Denies.  Defendant avers that DNCY was the highest scoring bidder.

18.     Admits that DNCY accepted assignment of a merger agreement between YP&CC and the NPF.

19.     Denies.  Defendant avers that DNCY was not required to purchase all of the "other property" used by YP&CC in its operations because the contractual provision requiring the purchase of "other property" did not come into play at all as DNCY acquired the new concession's assets through a merger, not a purchase of assets.

20.     Denies.  DNCY was not required to purchase all "other property."  Defendant avers that, unless expressly withheld, all assets of a corporation are transferred in a merger, including any intangible assets.  Defendant further avers that DNCY failed to disclose the intangibles on its initial balance sheet, so defendant is without sufficient information to affirm or deny whether any value was attributed to the intangibles in determining the price for the stock purchase.  Moreover, defendant avers that Badger Pass was not a USPTO-registered trademark owned by YP&CC in 1993, so DNCY did not acquire title to that registration through the merger.

21.     Admits that DNCY's Concession Contract obligates the NPS to require a successor concessioner at Yosemite to purchase property from DNCY, but denies that similar language in the YP&CC contract was used, because such language was superseded by the merger.

22.     Admits that Section 13(b)(1) of DNCY's Concession Contract is quoted accurately.

23.     The allegations in paragraph 23 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant admits that DNCY's Concession Contract requires the NPS to require the

successor to purchase DNCY's possessory interest and "other property" as a condition to the granting of the next contract. Defendant denies any implication that the purchase must be completed before the new contract becomes effective. Defendant avers that historically it has been standard practice for an incumbent concessioner and its successor to negotiate and close on the purchase of "other property" after the effective date of the new concession contract. Also, defendant avers that plaintiff holds no possessory interest under its Concession Contract and has made no prior demands for compensation for any possessory interest before the date of its first amended complaint.

24.     The allegations in paragraph 24 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required. Defendant further avers that no possessory interest exists to be purchased by a successor concessioner.

25.     The allegations in paragraph 25 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required. To the extent they may be deemed allegations of fact, they are denied. Defendant further avers that plaintiff failed to attribute any value to such alleged operational assets on its Annual Financial Reports (AFRs).

26.     Admits that DNCY obtained federal registrations, but denies that NPS expressly required DNCY to purchase them from YP&CC. Instead, defendant avers that it required DNCY to purchase the stock of YP&CC through a merger. Defendant lacks knowledge to admit or deny whether DNCY obtained any state registrations or whether it exhibited a continuity of use.

27.     Denies. Defendant avers that Section 2(b) of DNCY's Concession Contract allows NPS to regulate DNCY's business activities, in part, as follows:

> Except as otherwise in existence as of the effective date of this contract, the Concessioner's business activities during the term of this contract shall be limited strictly to those authorized by this contract.

Defendant further avers that the contract does not authorize any trademark or servicemark registrations.

28.     Denies.  Defendant further avers that plaintiff represented in its proposal for the Concession Contract that it would go forward with a "trademarked" program with respect to Yosemite National Park, at least as to certain registrations, "only with full NPF approval." Plaintiff, however, never sought approval of NPF or NPS with respect to its trademark program or even advised NPS of the program directly.

29.     Plaintiff's allegations concerning constructive knowledge involve a conclusion of law as to which no response is required.  Admits that defendant had actual knowledge of plaintiff's intermittent use of trademark registration symbols on certain printed materials and some communications with DNCY in the past decade.

30.     Admits first sentence of paragraph 30.  Nevertheless, defendant avers that plaintiff never notified defendant directly prior to any application for registration or continuation of same and DNCY failed to reveal to the USPTO that its interest in the Yosemite-related names was associated with a concession contract of a limited length.  Admits the second sentence insofar as a public record exists, but lacks sufficient information to admit or deny regarding the record beyond the online USPTO archive.  Defendant lacks sufficient knowledge to admit or deny the first clause of the third sentence as to whether each of plaintiff's applications was published, but admits the second clause that NPS brought no opposition.  Defendant lacks sufficient knowledge to admit or deny the final sentence.

31.     Admits as to the allegations in the first sentence.  Denies the suggestion in the second sentence that trademarks necessarily increase in value as they gain in recognition and

denies the implication that the goodwill among consumers and potential consumers is only associated with a tradename or trademark.

32.     The first and second sentences of the allegations in paragraph 32 consist of legal conclusions and plaintiff's characterizations of its case as to which no answer is required.  To the extent a response may be required, defendant denies.  The last sentence in paragraph 32 purports to characterize the contents of DNCY's Concession Contract, a document that speaks for itself and is the best evidence of its contents.  Defendant denies any allegations that are inconsistent with the plain language, meaning, or context of DNCY's Concession Contract.  Furthermore, with respect to the final sentence of paragraph 32, defendant avers that Section 2(b)(1) of DNCY's Concession Contract controls, and it states, in part, that:

> The Secretary reserves the right to determine and control the nature, type and quality of the merchandise and services described herein as authorized and required to be sold or furnished by the Concessioner within the Area.

33.     The allegations in paragraph 33 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent that they may be deemed allegations of fact, they are denied.  Defendant further avers that (i) much of the goodwill claimed by DNCY is attributable to the location of the Concession Facilities within the unique landscape of Yosemite National Park; and (ii) all of DNCY's services were provided pursuant to its highly-regulated concession contract with NPS.

34.     The allegations in paragraph 34 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent that they may be deemed allegations of fact, they are denied.

35.     Defendant lacks sufficient information to affirm or deny the allegations in paragraph 35.   To the extent that a response is required, they are denied.

36.     As to the first sentence, defendant lacks sufficient information to respond.  The second and third sentences consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.   To the extent that they may be deemed allegations of fact, they are denied.  Defendant avers that, during the term of its Concession Contract, DNCY never reported any alleged capital improvement as a possessory interest claim on its AFRs. Defendant further avers that DNCY's Concession Contract, in Exhibit I Maintenance Plan, requires plaintiff to perform certain cyclical maintenance and rehabilitation work, including what DNCY now characterizes as improvements, as part of plaintiff's repair and maintenance obligation, for which it is not entitled to compensation.  Finally, defendant avers that it has advised plaintiff that the fixed capital asset claims listed in the report prepared for DNCY by American Appraisal Associates, Inc. (AAA) that consist of unaffixed personalty (such as soft goods and case goods) should be included in "other property" as tangible personal property, but that the parties need to verify that such items are not counted twice.

37.     The allegations in paragraph 37 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.   To the extent that they may be deemed allegations of fact, they are denied.  Defendant avers that DNCY's Concession Contract is governed by the National Park Service Concessions Management Improvement Act of 1998, Pub. L. No. 105-391, 112 Stat. 3497, and codified at 54 USC Chapter 101901, et seq. ("1998 Act").  The 1965 Act cited by plaintiff has been repealed.  The provisions of the 1998 Act apply to DNCY's Concession Contract except to the extent such provisions are inconsistent with the Concession Contract's terms and conditions.

38.     The allegations in paragraph 38 purport to characterize the contents of a statute, which speaks for itself and is the best evidence of its contents.  Defendant avers that the definition of possessory interest cited by plaintiff fails to include the entire definition.

39.     The allegations in paragraph 39 purport to characterize the contents of DNCY's Concession Contract, which speaks for itself and is the best evidence of its contents.  Defendant also avers that Section 4(b)(3) of DNCY's Concession Contract does not provide the only exception as to what will qualify as a possessory interest (e.g., see Section 4(f)).  Moreover, the text of the Maintenance Plan defines "maintenance" as keeping real property in, as nearly as is practicable, the originally constructed condition or its subsequently improved condition, which may include replacement of components that plaintiff now characterizes as possessory interest claims.  Moreover, plaintiff did not seek a possessory interest determination prior to making the repairs or improvements and failed to report the work as new possessory interests on Schedule D of its AFRs as required.

40.     The allegations in paragraph 40 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent that they may be deemed allegations of fact, they are denied.

41.     The allegations in paragraph 41 purport to characterize the contents of DNCY's Concession Contract, which speaks for itself and is the best evidence of its contents.  Defendant avers that the fourth paragraph of Section V.A. of the Maintenance Plan required the plaintiff to "submit a written request to the Service and obtain written approval" with respect to every piece of work that would result in "an increase in Possessory Interest claimed by Concessioner in a structure or facility" and that plaintiff failed to do so.  Moreover, plaintiff failed to report any additions to its possessory interest on its AFRs.

42.     The allegations in paragraph 42 purport to characterize the contents of DNCY's Concession Contract, which speaks for itself and is the best evidence of its contents. To the extent that a response is required, defendant denies.

43.     The allegations in paragraph 43 purport to characterize the contents of DNCY's Concession Contract, which speaks for itself and is the best evidence of its contents.  To the extent a response is required, defendant denies.  Defendant avers that the Maintenance Plan requires the Concessioner to carry out preventative and cyclical maintenance (Section V.A.) and that certain items now claimed by DNCY as possessory interests in fact consist of preventative and cyclical maintenance (e.g., to repaint exteriors on a seven year cyclical basis and interiors on a five-year cyclical basis per Section V.A.2 of Maintenance Plan).

44.     The allegations in paragraph 44 purport to characterize the contents of DNCY's Concession Contract, which speaks for itself and is the best evidence of its contents.  To the extent a response is required, defendant denies.  Defendant also avers that Section V.A. of the Maintenance Plan requires that the Concessioner seek NPS approval before performing work that would be eligible for possessory interest and that NPS never approved any possessory interest work.  Moreover, defendant avers that plaintiff never reported its work as possessory interest eligible on its AFRs as required.

45.     The allegations in paragraph 45 purport to characterize the contents of DNCY's Concession Contract, which speaks for itself and is the best evidence of its contents.  To the extent a response is required, defendant denies.  Defendant avers that the Maintenance Plan does not state that the concessioner is entitled to compensation of any sort for the cost of such work if Capital Improvement Fund (CIF) funds are not available, and, in fact, much work was delayed or re-scheduled because the CIF funds lacked sufficient funds when requests were made.

46.     Denies.  Defendant avers that its testimony at the Joint Oversight Hearing on March 24, 1993 stated that, while the concesser could put in its own additional money "to build a building" [not to perform maintenance obligations], in which case it would get possessory interest on an essentially book value schedule, the statement contained the key modifying clause, "if it [the concessioner] chooses *and agrees with the Government*."  (Emphasis added).   The plaintiff in fact never sought possessory interest eligibility for any project and NPS never agreed to grant any possessory interest.

47.     Defendant lacks sufficient information to affirm or deny the allegations of paragraph 47, in part, because defendant disagrees with plaintiff's characterization of certain actions as "non-routine capital improvements."  Defendant also avers that it never compelled DNCY to fund any CIF-eligible projects for which there were insufficient funds; instead, such projects were deferred (sometimes for more than one year) or cancelled.  Defendant also avers that DNCY completed certain projects in conjunction with CIF-eligible projects, but DNCY was required to complete only those elements that were not eligible for CIF funding, such as replacement of soft goods.

48.     Defendant lacks sufficient information to affirm or deny the allegations of paragraph 48, in part, because it disagrees with plaintiff's characterization of certain actions as "non-routine capital improvements."  Defendant avers that it never approved a construction project as possessory interest eligible.

49.     Defendant lacks sufficient information to affirm or deny the allegations of the first sentence of paragraph 49.  Defendant admits the second sentence of paragraph 49.  Defendant avers that the same Schedule D called for DNCY to identify any new possessory interest claims on an annual basis but it never disclosed any.

50.     The allegations contained in paragraph 50 consist of conclusions of law and plaintiff's characterizations of its case, as to which no response is required.  To the extent a response is required, defendant denies.

51.     The allegations contained in paragraph 51 consist of conclusions of law and plaintiff's characterizations of its case, as to which no response is required.  To the extent a response is required, defendant denies.  Defendant also avers that DNCY reported nothing in any of its AFRs during the Concession Contract term under the portion of Schedule D labeled for new possessory interest investments, and that all of DNCY's entries on Schedules D were in columns labelled under "Non- Possessory Interest Assets."  Defendant further avers that non-possessory interest assets do not have associated compensatory rights.  Finally, with respect to the final sentence in paragraph 51, defendant admits that the auditor's notes to the pertinent schedule for all years other than 1997 contain some reference to the company being reimbursed for certain concessioner-owned assets, but denies that the characterization of the effect of such language by an accountant creates a right to compensation.  Moreover, defendant avers that once something becomes affixed to NPS realty, it becomes property of the United States, so it cannot also be concessioner-owned property used or held for use in its operations.

52.     The allegations contained in paragraph 52 consist of conclusions of law and plaintiff's characterizations of its case, as to which no response is required.  To the extent a response is required, defendant denies.

53.     The allegations contained in paragraph 53 consist of conclusions of law and plaintiff's characterizations of its case, as to which no response is required.  To the extent a response is required, defendant denies.  Defendant avers, for example, that periodic repainting is required routine maintenance per the Maintenance Plan, yet DNCY asserted a claim for over

three-quarters of a million dollars for painting in its list of fixed capital assets attached to AAA's appraisal report.

54.     The allegations contained in paragraph 54 consist of conclusions of law and plaintiff's characterizations of its case, as to which no response is required.  To the extent a response is required, defendant admits that DNCY is entitled to payment for personal property not affixed to the realty (e.g. soft goods, case goods, rugs), but denies that DNCY holds any possessory interest.

55.     The allegations contained in paragraph 55 consist of conclusions of law and plaintiff's characterizations of its case, as to which no response is required.  To the extent a response is required, except as set forth in its response to paragraph 54 above with respect to un-affixed personalty, defendant denies.

56.     Admits.

57.     Denies.  Defendant admits, however, that DNCY advised it by letter dated May 30, 2014, that its claim for other property would total approximately $100 million at the end of its Concession Contract according to DNCY's valuation.  Defendant also avers that, prior to May 30, 2014, DNCY had not advised the NPS of the amount and specific nature of its other property claims, including any claim for intellectual property, despite requests by the NPS earlier in the Prospectus development process.

58.     Admits.

59.     Admits the first sentence.  Defendant denies the allegations in the second sentence that it possessed "extensive information about the assets that DNCY had previously provided," so it would have been premature for the NPS to identify its concerns at July 3, 2014.

60.     Admits.

61.     Admits that the scope of services allowed under the proposed contract was reduced, but denies the accuracy of some of plaintiff's allegations in the rest of the paragraph with respect to specific services.

62.     Denies.

63.     Admits.

64.     Admits the first sentence.  Denies the second sentence.  Avers that the Prospectus accurately stated that the personal property list provided was prepared by DNCY, but avers that the NPS then had a consultant review and value DNCY's personal property, so that the printed version was an amalgam.

65.     Admits the first sentence but further avers that NPS stated in a letter to DNCY on July 3, 2014, that it was reluctant to notify other potential bidders until it had further substantiation of DNCY's claims.  Further avers that DNCY put other potential bidders on notice of its claims in a letter dated October 13, 2014.

66.     The allegations contained in paragraph 66 consist of plaintiff's characterizations of its case to which no response is required.  To the extent a response is required, defendant denies.

67.     The allegations contained in paragraph 67 consist of plaintiff's characterizations of its case to which no response is required.  To the extent a response is required, defendant denies.  With regard to the allegation that the NPS insists that certain types of property are not compensable, defendant avers that affiliates of DNCY (e.g., at Shenandoah and Olympic National Parks) are familiar with NPS's position concerning non-compensable property from their history as successor concessioners under other 1965 Act contracts in which the successor was not required to purchase the types of property for which DNCY is now asserting claims.

68.     The allegations contained in paragraph 68 consist of plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.  Furthermore, with respect to the first sentence, defendant avers that DNCY is familiar with the historic practice of incumbents and incoming concessioners negotiating the purchase price of other property without NPS participation and often after the transition date, based on the experiences of its affiliates.  With respect to the second sentence, defendant further avers that the successor concessioner is Yosemite Hospitality, LLC (YHL), a wholly-owned subsidiary of Aramark Sports & Entertainment, LLC. (hereafter, collectively "Aramark").  With respect to the third sentence, defendant also avers that plaintiff had threatened an infringement action if the names were used by the successor concessioner without its consent.

69.     Admits but avers that plaintiff did not provide full versions of its appraisals supporting its valuations until December 2014.

70.     Admits as to the first sentence but further avers that the NPS was reviewing the intangible property valuation report of CONSOR Intellectual Asset Management (CONSOR), retaining third-party assistance in review of the CONSOR valuation, and analyzing the AAA appraisal report.  The remaining sentences constitute characterizations of the September 3, 2014, letter, a document which speaks for itself and is the best evidence of its contents.

71.     Admits.

72.     Admits.

73.     Admits.

74.     Defendant lacks sufficient information to admit or deny the allegation in paragraph 74.

75.     Admits but avers that the NPS did not accept these offers because Aramark, not the NPS, had the obligation to negotiate the "fair value" of DNCY's "Other Property."

76.     Admits.

77.     Denies as to first sentence.  Avers that, in Amendment No. 9 to the Prospectus, the NPS stated that "[i]n view of the assertions by the Existing Concessioner (which the Service has been advised have been communicated by the Existing Concessioner directly to other prospective Offerors), the Service supplements and modifies the Prospectus as follows . . . ."  As to the second sentence, admits that the NPS stated that DNCY had not provided sufficient data to support the independent appraisals, and avers that the statement was correct.

78.     Admits and further avers that the NPS stated that it would "continue to investigate the Existing Concessioner's claims and will make any necessary adjustments through a future amendment."

79.     Admits.

80.     Denies and further avers that the NPS wanted to avoid an infringement claim if the issue was not settled sufficiently in advance of the transfer of the concession operations at Yosemite.

81.     The allegations contained in paragraph 81 consist of plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies that the goodwill will be discarded by changing the trademarked names and avers that the goodwill associated with the properties is associated in large part with their location within Yosemite National Park and their ownership and stewardship by the NPS.

82.     Admits as to first sentence.  As to the second sentence, admits that Amendment 9 to the Prospectus did not address "routine maintenance" or any prior representation about compensability but otherwise denies.

83.     Admits, with respect to the CONSOR and AAA valuations and denies with respect to any other valuations or appraisals prepared by or for DNCY.

84.     Admits but avers that NPS did not have a final report with respect to the intangible property valuation until January 2015.

85.     Admits that DNCY and the NPS met on December 8, 2014.  Denies plaintiff's characterizations of the meeting.

86.     Admits.

87.     Admits and further avers that requiring potential offerors to conduct their own due diligence is standard language for NPS concession prospectuses.

88.     Admits.

89.     Admits as to first sentence.  Admits that the NPS's independent analysis was finalized in January 2015 but further avers that a substantive draft for final review had been provided to the NPS prior to publication of Amendment 12 to the Prospectus.

90.     Admits that NPS has not disclosed its analysis.  Avers that in its July 16, 2015, letter to DNCY, the NPS stated it would share its appraisal if DNCY shared its entire appraisal with Aramark and if all parties signed a nondisclosure agreement.  Defendant further avers, on information and belief, that DNCY has not yet shared its appraisal with Aramark.

91.     Admits.

92.     Admits, assuming the definition of Aramark includes YHL.

93.     Admits but avers that the NPS had gained Aramark's commitment to purchase DNCY's Other Property in Aramark's Offeror Transmittal Letter, consistent with past practice. Further avers that the NPS explained this in a July 16, 2015, letter to DNCY.  Defendant further avers that it is common practice for incumbents and successor concessioners to negotiate and finalize sales of personal property after the date of transition to the new contract.

94.     Denies, but further avers that the NPS was not obligated to require Aramark to purchase DNCY's other property prior to award of DNCY's Concession Contract.  Defendant also avers that DNCY had asserted no claims for possessory interest as of that date.

95.     Admits.

96.     The statements in paragraph 96 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

97.     Admits that the NPS declared that it will not require Aramark to purchase what DNCY claims as "fixed capitalized assets."  Defendant avers that no definition of "fixed capitalized assets" is found in relevant statutes, regulations, policies, or in DNCY's Concession Contract.  To the extent a response is required, defendant denies the remaining allegations in paragraph 97.  Defendant avers that pre-approval of construction or installation of a project is not a singularly sufficient condition for a project's eligibility for compensation.  Defendant also avers that, pursuant to 54 U.S.C. §101915(e), once a capital improvement is constructed or installed by a concessioner on land owned by the United States in a National Park, title is vested in the United States, so that plaintiff has no property to sell with respect to most of its alleged "fixed capitalized assets."

98.     Denies.  Further avers that DNCY would only be eligible for possessory interest if its projects had been explicitly pre-approved as such.  Further avers that the NPS stated that DNCY was not entitled to compensation for fulfillment of its maintenance obligations.

99.     Admits in part and denies in part depending on the nature of the claimed fixture. If affixed to the structure then it became a part of property owned by the defendant and is ineligible for sale by the plaintiff.

100.    Denies plaintiff's characterization of the nature of NPS's communication.  Admits that NPS informed DNCY that NPS would not require the successor concessioner to purchase intangible property developed, owned, or claimed by DNC.

101.    Defendant does not have sufficient information to admit or deny the allegations in paragraph 101.  Denies that DNCY was required to purchase YP&CC's "other property" outright.  Defendant further avers that DNCY purchased YP&CC's stock, not its assets.

102.    Denies that NPS unequivocally repudiated any obligation of DNCY's Concession Contract.  Admits that DNCY commenced the lawsuit on September 17, 2015.

103.    Admits.

104.    Admits the first sentence.  The second sentence purports to characterize the language of DNCY's Concession Contract, which is the best evidence of its content.

105.    Admits the first sentence.  The remaining sentences in paragraph 105 are legal conclusions and plaintiff's characterizations of its case which do not require a response.  To the extent a response is required, defendant denies.

106.    Admits and further avers that the asserted trademarks are completely dependent on DNCY's relationship with the NPS regarding operations at Yosemite National Park and

therefore, when the contract expires on March 1, 2016, DNCY will not have any valid Yosemite-related trademarks to license.

107.    Admits.

108.    Admits.

109.    The allegation in paragraph 109 are plaintiff's characterizations of its case and do not require a response.  To the extent a response is required, defendant denies.

110.    Denies.

111.    Denies.

112.    The allegations in paragraph 112 consist of plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

113.    The allegations in paragraph 113 consist of plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

114.    The allegations in paragraph 114 consist of plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

115.    Admits as to the first sentence.  Defendant does not have sufficient information to admit or deny the allegations in the second sentence.

116.     Defendant does not have sufficient information to admit or deny the allegations in the first and second sentences regarding what DNCY "relied upon" or "recognized" regarding its offer.   The allegations in the third sentence consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.

117.    Defendant does not have sufficient information to admit or deny the allegations in paragraph 117 regarding how DNCY accounted for any "opportunity cost" of performing the Concession Contract or how it would have bid in different circumstances.

## COUNT 1

118.    Defendant incorporates paragraphs 1 through 117 by reference.

119.    The allegations in paragraph 119 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  To the extent a response is required, defendant denies.

120.    The allegations in paragraph 120 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

121.    The allegations in paragraph 121 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

## COUNT II

122.    Defendant incorporates by reference paragraphs 1 through 121 above as if fully set forth herein.

123.    The allegations in paragraph 123 consist of legal conclusions to which no response is required.

124.    The allegations in paragraph 124 consist of legal conclusions to which no response is required.  To the extent a response is required, defendant denies.

125.    Denies.

126.    Denies.

## COUNT III

127.    Defendant incorporates by reference paragraphs 1 through 126 above as if fully set forth herein.

128.     The allegations in paragraph 128 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

129.     The allegations in the first sentence of paragraph 129 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  The allegations in the second sentence purport to characterize the regulations at 36 C.F.R. §51.4 and §51.19, documents that speak for themselves and are the best evidence of their content.  Defendant denies any allegations that are inconsistent with the plain language, meaning, or context of 36 C.F.R. §51.4 and §51.19.

130.     The allegations in paragraph 130 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

131.     The allegations in paragraph 131 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

132.     The allegations in paragraph 132 consist of legal conclusions and plaintiff's characterizations of its case, to which no response is required.  To the extent a response is required, defendant denies.

133.     The allegations in paragraph 133 are a prayer for relief, which requires no answer. To the extent that an answer is required, defendant denies that plaintiff is entitled to the requested relief.

<u>AFFIRMATIVE DEFENSE:  MOOTNESS</u>

134.    In Amendment 12 to the Prospectus, NPS indicated that any new concessioner at Yosemite National Park would be required to purchase certain of DNCY's intangible property.  In Amendment 12, NPS estimated a value of $3.5 million for that portion of DNCY's intangible property.

135.    By letter to DNCY dated August 28, 2015, more than two months after NPS's selection of Aramark as the new concessioner, NPS stated that it would not require Aramark to purchase any of DNCY's intangible property.

136.    By letter to DNCY served on December 31, 2015, with a copy to Aramark, NPS stated that it was withdrawing its August 28, 2015, letter insofar as the August letter was inconsistent with Amendment 12 to the Prospectus.  NPS further informed DNCY and Aramark that DNCY's trademark registrations fall within the category of "other property" that Aramark must purchase at fair value.

137.    Aramark replaces DNCY as the concessioner at Yosemite on March 1, 2016.

138.    DNCY's claims in Count I regarding NPS's failure to require Aramark to purchase and pay fair value for any intangible property identified in Amendment 12 that "DNCY uses or holds for use in connection with its Yosemite operations" are moot.

139.    Similarly, Count II of DNCY's complaint seeking bid and proposal costs based upon DNCY's allegation that "NPS's post-award announcement that Aramark would not be required to purchase DNCY's intellectual and other intangible property was contrary to the terms of the Prospectus" is moot.

AFFIRMATIVE DEFENSE:  FAILURE TO STATE
A CLAIM UPON WHICH RELIEF CAN BE GRANTED

140.    Section 5 of DNCY's Concession Contract requires DNCY to maintain and repair all Government-owned buildings, structures, utility systems, fixtures, equipment and other improvements as well as Concessioner Improvements used by DNCY in its Yosemite concession operations.

141.    Pursuant to Section 5(a)(2) of DNCY's Concession Contract, a comprehensive Maintenance Plan is incorporated into DNCY's Concession Contract.

142.    DNCY's Concession Contract, together with the Maintenance Plan, specifies that maintenance and repairs are part of DNCY's duties under the contract.  DNCY was required to set aside funds in an escrow to assist with funding these duties; in addition, the contract requires that additional Concessioner funds may be necessary to fulfill its repair and maintenance obligations.

143.    The Maintenance Plan defines "Repair" as the act of correcting an unsatisfactory physical condition which may include replacement when appropriate.  Examples of DNCY's responsibilities set forth in the Maintenance Plan include:

- interior painting on a five-year schedule or more often as needed (§ V.A.2.)

- the replacement of lighting, heating and cooling systems (§ V.A.3.)

- the replacement of all interior and exterior utility systems within concessioner land assignments (§ V.A.4.)

- the maintenance, repair, and replacement of fixtures attached to the sewage disposal system (including sinks, toilets, urinals and dish-washing equipment) (§ V.H.4.).

144.    Accordingly, pursuant to DNCY's Concession Contract, items such as periodic repainting and carpet replacement properly fall within DNYC's non-compensable repair and maintenance obligations.  Moreover, the contract does not state that the Concessioner has any right to compensation for the cost of fulfilling its repair and maintenance obligations.

145.    DNCY claims, based on the conclusions of its appraisal company, AAA, that DNCY's "other property" that must be transferred under the contract includes the capitalized value of maintenance and improvements made by DNCY to Government-owned buildings and land assignments, which it values at $14,266,820.  DNCY has also adopted AAA's determination that the value of certain "construction in progress" is $755,355.  Instead of recognizing this improvement and construction work as falling under DNCY's non-compensable maintenance and repair obligations, DNCY characterized the capitalized value of these categories of work as a property interest, and gave them the novel label "fixed capital assets."

146.    In a letter dated November 11, 2014, DNCY listed examples of "fixed capital assets" including bathroom renovation, public restrooms renovation, and the Ahwahnee corridor and guest room carpet replacement.  The itemized list of "fixed capital assets" contained in the AAA report further included the cost of repainting walls; the cost of replacing carpet, flooring, and plumbing and lighting fixtures; rodent abatement labor; as well as materials such as wallpaper, carpeting and linoleum.

147.    Pursuant to 54 U.S.C. §101915(e), once a capital improvement is constructed or installed by a concessioner on land owned by the United States in a National Park, title is vested in the United States.  Accordingly, upon installation, the plaintiff no longer owns such property so it cannot purport to sell it to a successor concessioner.  Thus, DNCY's claims for installed

fixtures, carpeting, paint and the like are prohibited by law because those assets are owned by the United States.

148.    Although the vast majority of these "fixed capital assets" that DNCY demands that the NPS require the new concessioner buy are actually composed of non-compensable repair and maintenance costs, some items may more properly be categorized as:  (1) items for which DNCY might have been entitled to compensation as possessory interest but for which it failed to obtain required NPS pre-approval as possessory interest and failed to report as possessory interest on its AFRs, or (2) items of personal property for which defendant acknowledges DNCY is already entitled to compensation under a separate part of Section 13 of DNCY's Concession Contract.

149.    DNCY's category of "fixed capital assets" is not a category of compensable interest recognized in the contract.  The contract spells out the possible categories, both compensable and non-compensable, under which property and labor claims can fall.  Merely characterizing the capitalized value of required, non-compensable maintenance and repair work as a new category of "fixed capital assets," does not transmute this obligation into a property interest that the new concessioner must purchase as part of DNCY's "other property."  For example, DNCY's list of "fixed capitalized assets" includes claims for labor, which cannot be a fixed capitalized *asset*, and therefore cannot be entitled to compensation as such.

150.    Finally, defendant is unaware of any previous claim for such "fixed capital assets" from any concessioner in the history of the NPS concessions program, including contracts where DNCY affiliates were either the successor or the incumbent concessioner.  Accordingly, pursuant to DNCY's Concession Contract, DNCY is not entitled to compensation for its novel category of "fixed capital assets."

<u>AFFIRMATIVE DEFENSE: UNENFORCEABILITY</u>

151.    Yosemite National Park is internationally recognized for its spectacular granite cliffs, waterfalls, clear streams, giant sequoia groves, and biological diversity.  The park had approximately 4.2 million visitors in 2015 and since 2006 more than 40 million people have visited Yosemite National Park.

152.    Concession contracts at National Parks can be lucrative because concessioners operate on Federal land, in unique geographical areas, and in a monopoly-like setting within the National Parks themselves.

153.    Moreover, because concession operations are located within unique and often spectacular National Park settings that attract large numbers of visitors to the area, concessioners do not have to spend as much money on marketing as they otherwise might have to.

154.    At Yosemite National Park, all of the hotels, restaurants and recreational infrastructure, known as Concession Facilities, are owned by the United States.  Apart from the advantage of not having to undertake and pay for initial construction activity, concessioners are spared the property taxes that would result from owning such properties.

155.    DNCY did not own, and has never owned, any of the hotels, restaurants or recreational infrastructure located within Yosemite National Park.  Nor has DNCY ever had a "possessory interest" in any of the hotels, restaurants or recreational infrastructure located within Yosemite, as that term is defined in the National Park Service Concessions Policy Act, Public Law 89-249 (repealed by the National Park Service Concessions Management Improvement Act of 1998, Pub. L. No. 105-391, codified at 54 USC Chapter 1019).

156.    In DNCY's proposal for its original Concession Contract in 1993, DNCY recommended a program to explore "the development of a Yosemite National Park logo, which

should then be trademarked." DNCY represented that it "would go forward with the program only with full [National Park Foundation] approval." DNCY, however, never sought approval of the National Park Foundation or the NPS with respect to its trademark program or even advised the NPS of the program directly.

157.    In 2002, without providing notice to NPS of its intent to do so, DNCY filed applications with the United States Patent and Trademark Office (USPTO) to register several trademarks related to properties owned by the United States at Yosemite. These included applications to register trademarks for the phrase "Yosemite National Park," and for the names of iconic hotels and recreation areas, including "The Ahwahnee," "Wawona," "Yosemite Lodge," "Badger Pass," and "Curry Village."

158.    "Ahwahnee" means "gaping mouth" in Miwok. It is the name for the historic hotel commissioned by the NPS in 1925-1927 to accommodate tourism in Yosemite National Park. Commercial hotel and related services are provided for visitors by a third-party concessioner under contract with the NPS. The hotel was designated as a National Historic Landmark in 1987.

159.    Curry Village is a historic tent and rustic lodging facility located within Yosemite National Park that carries the namesake of the original concessioners of the facility, David Curry and Jenny Foster Curry. Commercial lodging, food and beverage, and related services are provided to visiting tourists by a third-party concessioner operating under contract with the NPS. Originally named "Camp Curry," the name was changed to Curry Village in 1970 and the facilities were placed on the National Register of Historic Places in 1979.

160.    "Wawona" is Miwok for "Big Trees" and the name for The Wawona Hotel, a historic hotel built in 1876, and re-named "Wawona" in 1883. Commercial hotel and related

services are provided for visitors by a third-party concessioner under contract with the NPS.  In 1987 the hotel was designated as a National Historic Landmark.

161.    Badger Pass is the name of a ski area located in Yosemite National Park. Commercial services including restaurant and retail and ski school services are provided for visitors by a third-party concessioner under contract with the NPS.

162.    On January 31, 2002, DNCY filed Application Serial No. 76365484 for YOSEMITE NATIONAL PARK covering certain goods in International Classes 16, 21, and 25 based on its purported use of the mark in United States commerce for all goods listed in the application.  Thereafter, on May 13, 2003, the application matured to registration as Registration No. 2715307.

163.    On June 3, 2002, the USPTO examining attorney ("the Examiner") assigned to review the application rejected DNCY's application to register a trademark for YOSEMITE NATIONAL PARK, in part, because the trademark would have presented a false association between DNCY and the NPS.  The Examiner found that "'Yosemite National Park' identifies the National Park Service."  In addition, the Examiner found that Yosemite National Park "is an extremely famous national park."  Ultimately, the Examiner found that "the fame of the National Park Service is of such a nature that when [DNCY] uses [Yosemite National Park] for its goods," the public presumes "a connection with the National Park Service."

164.    On December 2, 2002, DNCY responded to the Examiner's rejection.  DNCY did not challenge the Examiner's finding that "'Yosemite National Park' identifies the National Park Service."  DNCY did not challenge the Examiner's finding that Yosemite National Park "is an extremely famous national park."  DNCY did not challenge the Examiner's finding that "the fame of the National Park Service is of such a nature that when [DNCY] uses [Yosemite

National Park] for its goods," the public presumes "a connection with the National Park

Service." Instead, DNCY argued that its association with NPS was not false, and as proof of

that, DNCY submitted three pages of its concession contract with NPS, identifying the parties to

the contract.

165.    Even though DNCY submitted only a small portion of the Concession Contract to

the Examiner, DNCY heavily redacted contract language that indicated that DNCY's rights in

Yosemite-related trademarks were limited. DNCY intentionally redacted the introductory text of

the contract that stated that Yosemite National Park is administered by the NPS. DNCY

intentionally redacted the text of the "Term of the Contract" section of the contract that set the

expiration of the contract for September 30, 2008. Moreover, DNCY redacted the following

passage of its contract with NPS:

> The Secretary [of the Interior, through the Director of the National Park Service]
> reserves the right to determine and control the nature, type and quality of the
> merchandise and services described herein as authorized and required to be sold or
> furnished by the Concessioner within [Yosemite National Park].

166.    Following DNCY's submittal of the redacted copy of portions of DNCY's

concession contract with NPS, the USPTO reversed its earlier ruling rejecting DNCY's petition

for a trademark for the phrase "Yosemite National Park."

167.    On July 11, 1988, Yosemite Park and Curry Company (YPCC) filed trademark

Application Serial No. 73739312 in the USPTO for THE AHWAHNEE covering certain

services in International Class 42 based on its purported use of the mark in United States

commerce for the services listed in the application. Thereafter, on March 7, 1989, the

application matured to registration as Registration No. 1529066. On August 4, 2003, the USPTO

registered the conveyance of YPCC's trademark registration for THE AHWAHNEE to DNCY.

168.    On July 1, 2002, DNCY filed Application Serial No. 76426371 for THE

AHWAHNEE covering certain goods in International Classes 11, 14, 21, 24, and 25 based on its

purported intent to use the mark in United States commerce for the goods listed in the

application.  DNCY later deleted its claim to International Class 11.  Thereafter, on October 7,

2003, the application matured to registration as Registration No. 2772512.  On September 28,

2009, DNCY deleted its claim to International Class 14 from its registration.

169.    DNCY submitted a specimen with its application to support its claim that it was

using THE AHWAHNEE in United States commerce.  In the specimen, DNCY describes The

Ahwahnee as a "Yosemite landmark."

170.    On February 4, 2002, DNCY filed Application Serial No. 76366341 for CURRY

VILLAGE covering certain services in International Classes 41 and 43 based on its purported

use of the mark in United States commerce for the services listed in the application.  Thereafter,

on February 11, 2003, the application matured to registration as Registration No. 2685968.

171.    On January 31, 2002, DNCY filed Application Serial No. 76365483 for

WAWONA covering certain services in International Classes 35, 41, and 43 based on its

purported use of the mark in United States commerce for the services listed in the application.

Thereafter, on July 22, 2003, the application matured to registration as Registration No.

2739708.

172.    DNCY submitted a specimen with its application to support its claim that it was

using WAWONA in United States commerce.  In the specimen, DNCY describes Wawona as

"one of the oldest mountain resort hotels in California and a National Historic Landmark."

173.    On February 4, 2002, DNCY filed Application Serial No. 76366808 for

BADGER PASS covering certain services in International Classes 41 and 42 based on its

purported use of the mark in United States commerce for the services listed in the application.

DNCY later deleted its claim to International Class 42 from its application.  Thereafter, on June

3, 2003, the application matured to registration as Registration No. 2720778.

174.    On June 3, 2009, DNCY filed Application Serial No. 77751058 for BADGER

PASS covering certain goods in International Class 25 based on its purported use of the mark in

United States commerce for the goods listed in the application.  Thereafter, on December 29,

2009, the application matured to registration as Registration No. 3731325.

175.    In 2015, a trademark registration that DNCY had previously obtained to the word

"YOSEMITE" coupled with a design element (hereafter the "YOSEMITE (design)" trademark)

expired by operation of law.

176.    On September 30, 2015, *after* receiving notice that it had not been selected for the

new Yosemite concession contract, *after* filing its lawsuit in this matter, and just five months

before the termination of its Yosemite concession contract, DNCY filed Application Serial No.

86774150 for YOSEMITE (design) covering certain services in International Class 41 based on

its purported use of the mark in United States commerce for all services listed in the application.

177.    On January 27, 2016, the USPTO Examiner assigned to review the application

rejected DNCY's application to register a trademark for YOSEMITE (design) mark, in part

because the trademark would have presented a false association between DNCY and the NPS.

The Examiner found that "Yosemite National Park is so famous that consumers would presume a

connection" with the NPS.

178.    Further proceedings in the USPTO with respect to YOSEMITE (design)

trademark have been stayed pursuant to the TTAB's decision in response to DNCY's motion to

stay.

* * * * *

179.   DNCY's Concession Contract was originally for fifteen years, and therefore was set to expire in 2008.  By a contract amendment in 2003, the term was extended for three years, so that that its contract was then expected to expire in 2011.

180.   In 2010, approximately one year before its contract was expected to expire, DNCY retained CONSOR to provide DNCY with a valuation of DNCY's intellectual property at Yosemite.  As discussed further below in averments 184-85, DNCY did not inform NPS of the existence of this appraisal until July 2014.

181.   Operations under DNCY's Concession Contract were eventually lengthened by another five years, through February 29, 2016.

* * * * *

182.   Paragraph 13(b)(1)(i) of DNCY's Concession Contract requires DNCY, in the event that its contract expires, to "sell and transfer to the successor designated by the Secretary its POSSESSORY INTEREST in CONCESSIONER and GOVERNMENT IMPROVEMENTS, if any, as defined under this contract, and all other property of the Concessioner used or held for use in connection with such operations."

183.   Correspondingly, paragraph 13(b)(1)(ii) states that "the Secretary will require such successor, as a condition to the granting of a contract to operate, to purchase from the Concessioner such POSSESSORY INTEREST, if any, and such other property, and to pay the Concessioner the fair value thereof."

184.   DNCY did not reveal the existence, much less the value, of its intellectual property, "fixed capital assets" and other intangibles on its annual financial reports, even after it obtained its appraisals in 2010.

33

185.    Moreover, despite email requests from the NPS in December 2011 for property lists in connection with development of the Prospectus, DNCY failed to reveal the existence or the amount of any lists concerning its claims until May 30, 2014, at the earliest.  DNCY informed NPS directly that DNCY intended to seek compensation for trademarks it had obtained on Government-owned property in Yosemite during a January 2013 meeting with certain NPS employees.  DNCY did not, however, indicate during that meeting or before May 2014 the *amount* of compensation it was seeking, nor did it expressly delineate all of the trademarks for which DNCY would seek compensation.

186.    On May 30, 2014, DNCY wrote NPS, noting that DNCY was "aware that the NPS is in the process of preparing a request for proposal (RFP) for the primary concession contract in Yosemite."  DNCY then stated that:

> In anticipation of a potential RFP process, we have undertaken a valuation of the property that we use for our operations in the Park and believe the total value of such property will be approximately $100,000,000 as of the end of our contract. . . .  We are writing this letter now because we wanted to make sure that NPS is aware of this valuation so that NPS can ensure that potential bidders are properly informed in order to avoid a potential contractual dispute depending on the bidder selected.

187.    On June 5, 2014, DNCY responded to NPS's request for more information by providing a table showing five asset categories and summary valuations for each category of asset.  Among the valuations were $14,700,000 for "Other Assets" and $51,200,000 for "Intellectual Property."

188.    Later on that same day, June 5, 2014, NPS sent an email to DNCY requesting an itemized list for each category of assets referenced in DNCY's letter, "with the exception of the computers" (for which DNCY had claimed $700,000).

189.    By letter dated June 16, 2014, DNCY provided NPS a "schedule of asset values with a breakdown of asset categories."  In a manner similar to DNCY's June 5, 2014, letter, the schedule included summary valuations of $14,788,156 for "Other Assets" and $51,160,136 for "Intellectual Property – Trademarks, service marks, customer database and internet related intangibles," without any explanation or documentary support, while stating that "the fair value we have determined is an appropriate assessment of the amount that a successor concessioner would be required to pay us for the identified assets in the event that we are not the successful bidder."

190.    On July 3, 2014, the NPS regional director wrote to DNCY requesting more information about the categories of "Other Assets" and "Intellectual Property – Trademarks, service marks, customer database and internet related intangible assets" provided by DNCY in its June 16th letter.  The regional director noted that DNCY had not previously referred to those asset categories or provided NPS with a description of them.

191.    On July 9, 2014, NPS issued the Prospectus seeking bids for the new Yosemite concession contract.

192.    In a letter dated July 18, 2014 – one week after NPS issued the Prospectus – DNCY for the first time informed NPS that DNCY had obtained a valuation or appraisal of its claimed intellectual property assets from CONSOR in 2010.  DNCY provided NPS with a copy of CONSOR's report dated July 18, 2014, but the report lacked data supporting its conclusions.

193.    On November 20, 2014, NPS issued Amendment 9 to the Prospectus.  In that Amendment, the NPS stated that:

> Approximately a month before the Prospectus was to be published, the Service received notice from the Existing Concessioner that it believed the total value of its claim for "Other Property" totaled $100,000,000.  It supplied no details at that time.  On request by

> the Service, a week later the Existing Concessioner sent a letter
> breaking its claim into five general categories, including
> unspecified claims for over $51,000,000 in intellectual
> property ... and nearly $15,000,000, in unidentified 'Other Assets.'
> When asked for more detail, on June 16, 2014 the Existing
> Concessioner sent another letter merely breaking its claim into
> nine categories but providing little substance. . . .

194.    On December 1, 2014, DNC mailed NPS a complete copy of the CONSOR Report. DNCY relied on this CONSOR Report in asserting that the fair value of its intellectual property and at least some of its intangible property is $51 million. The CONSOR Report valued DNCY's trademarks and servicemarks at $35.5 million, and it added another $8.5 million in a so-called "brand extension value" of the trademarks and servicemarks. Thus, the CONSOR Report valued DNCY's trademarks and servicemarks, including their brand extension value, at $44 million. The remaining $7 million of the overall $51 million in intangible property was composed of customer database intangible assets and internet-related intangible assets.

195.    NPS obtained a valuation report prepared by third-party expert consultants, Dornbusch and Associates, who analyzed CONSOR's valuation of DNCY's intangible intellectual property. Following its receipt of the Dornbusch report, NPS valued DNCY's intellectual property and intangibles at $3.5 million. The $3.5 million was composed of a value of $1.63 million for DNCY's Yosemite-related trademarks, $620,000 for DNCY's internet-related intangibles, and $1.23 million for DNCY's customer database. Thus, DNCY's value of its trademarks and servicemarks, at $44 million, is *27 times* the amount of the $1.63 million value estimated by NPS.

196.    The CONSOR Report is fundamentally flawed and grossly inaccurate because it assumes – in the first instance – *the validity of DNCY's Yosemite-related trademark registrations*.

197.    Furthermore, the CONSOR report sets forth a valuation methodology that ignores the unique paradigm of a concession within a National Park:  namely, that the underlying properties are owned by the United States in a National Park where it is the unique, natural surroundings that draw visitors to the parks – and to the concessions – and not the strength of a particular hotel's or restaurant's "trade" name.  Moreover, the CONSOR Report ignores the fact that, to the degree that there is good will or trade facilitation present with respect to the name of a particular Government-owned property in Yosemite, that goodwill or trade facilitation is primarily the result of the properties themselves and their location within the Yosemite National Park – both of which are owned by the United States.

198.    The CONSOR Report also sets forth a claim for $8 million in a "brand extension" trademark value which purports to set a value of the various trademarks "beyond the borders of the operations of Yosemite National Park itself."  But Section 13(b)(1)(i) of DNCY's Concession Contract only provides that DNCY be compensated for the property "used or held for use in connection with such operations," meaning DNCY's operations *within Yosemite National Park*. Moreover, to our knowledge, DNCY itself never licensed any other entity to use any of its registered marks.  Therefore, any value attributable to "brand extension" is by definition not compensable as "other property" under the terms of the contract.

199.    In addition, the CONSOR Report is flawed because it assigns a value of $15 million to the Yosemite Park Brand Bundle – a group of registered trademarks that includes a Yosemite (design) trademark.  But the USPTO is cancelling the Yosemite (design) trademark registration because DNCY failed to make the required maintenance filings.  And the USPTO has initially refused DNCY's attempt to re-register the Yosemite (design) trademark because it presents a false association between DNCY and the NPS.

200.    On December 22, 2014, NPS issued Amendment 12 to the Prospectus.  In that Amendment the NPS stated that:

> The Service estimates the value of other property the Concessioner must purchase from the Existing Concessioner (but not including inventory) at approximately $30,600,000 in 2016 dollars.  This total includes: personal property such as furniture, trade fixtures, equipment, and vehicles; intangible property such as trademarks as discussed in previous solicitation amendments, the Existing Concessioner's customer database, and internet related intangibles. . . .  This is only an estimate, and the final determined value could differ from this estimate.

201.    Amendment 12 to the Prospectus also stated that:

> The following exhibit summarizes the estimated initial investment to be made by the Concessioner in 2016 dollars, which is projected to be $40,100,000, consisting of the purchase of the Existing Concessioner's personal property, inventory, supplies, start-up costs . . .  and working capital. . . .  "Other Property (other than Inventory)" includes $3.5 million for the Existing Concessioner's intangible property [.]"

202.    On January 5, 2015, DNCY filed a protest with the General Accountability Office (GAO) seeking to terminate the Prospectus for the new Yosemite concession contract because DNCY disputed the NPS's $3.5 million valuation of DNCY's intangible assets, and that dispute allegedly created, in relation to DNCY's estimate of $51 million, a "material uncertainty prohibiting a reasonable comparative evaluation of proposals."

203.    On April 14, 2015, the GAO dismissed DNCY's bid protest.

204.    On June 16, 2015, NPS selected Aramark as the winning bidder for the new Yosemite concession contract.  NPS had obtained bids for the new Yosemite contract from only two companies:  DNCY and Aramark.

205.    Following NPS's selection of Aramark as the winning bidder, DNCY has repeatedly requested that NPS demand that Aramark pay DNCY for its intangible property.

206.    On July 13, 2015, DNCY wrote to NPS stating that it would not negotiate with Aramark over the fair value of the intangible property.

207.    On July 27, 2015, DNCY wrote NPS stating, among other things, that it would be "premature" to provide the CONSOR Report to Aramark.

\*    \*    \*    \*    \*

208.    On February 26, 2017, NPS filed a consolidated petition in the TTAB to cancel DNCY's trademark registrations for Yosemite National Park, The Ahwahnee, Curry Village, Wawona, and Badger Pass.

209.    On March 14, 2016, DNCY moved to suspend NPS's proceeding to cancel DNCY's Yosemite-related trademark registrations arguing that the issues concerning DNCY's Yosemite-related trademarks, including the value of those trademarks, could be resolved in DNCY's litigation in the Court of Federal Claims (CFC).  Indeed, DNCY stated in its petition to suspend before the TTAB, that the CFC "[l]itigation will not only have a bearing on the issues before this Board, but will dispose of those issues."

210.    On May 18, 2016, the TTAB suspended NPS's proceeding holding that the CFC "may consider and even reach a determination of ownership rights in the marks at issue." Moreover, the TTAB concluded that "the civil action may be dispositive of or have a bearing on this proceeding."

211.    On June 10, 2016, in response to the TTAB's initial decision suspending NPS's petition to cancel, NPS filed a petition to the Director of the USPTO to reverse the TTAB's May 18, 2016 Order.

212.     On August 5, 2016, the Director of the USPTO issued a decision upholding the

May 18, 2016 stay of proceedings before the TTAB.  In that decision, the Director stated that

"the ownership status of the registrations that Petitioner is asking TTAB to cancel may be

adjudged by the Court" (i.e., by the CFC).

*     *     *     *     *

213.     Registered trademarks that improperly suggest a connection with "persons . . .

institutions, or national symbols" can be cancelled pursuant to 15 U.S.C. §§ 1052(a), 1119.

214.     The marks in the registrations for which DNCY asserts trademark ownership (the

asserted registrations) are the same as, or close approximations of, names used by the NPS.

215.     The marks in the asserted registrations are recognized by persons contemplating

financial transactions involving Yosemite-related goods and services as the same as, or close

approximations of, names used by the NPS.  The marks in the asserted registrations point

uniquely and unmistakably to the NPS.

216.     As of March 1, 2016, when the Concession Contract expired, the NPS became

totally disconnected from any activities performed by DNCY in connection with the marks in the

asserted registrations.

217.     The fame or reputation of the NPS is such that, when the marks in the asserted

registrations are used with DNCY's goods or services, a connection with the NPS is presumed.

218.     Accordingly, one or more of DNCY's registrations should be cancelled.

219.     Registered marks that have been abandoned can be cancelled pursuant to 15

U.S.C. §§ 1125(c), 1119.

220.     With the expiration of the Concession Contract, DNCY has, upon information and belief, discontinued all use in commerce of the marks in the asserted registrations in connection with the goods and services identified in the respective asserted registrations.

221.     Upon information and belief, DNCY does not intend to resume any use in commerce of the marks in the asserted registrations in connection with the goods and services identified in the respective asserted registrations.

222.     Accordingly, one or more of DNCY's registrations should be cancelled.

223.     Registered trademarks that dilute the distinctive nature of famous marks can be cancelled pursuant to 15 U.S.C. §§ 1125(c), 1119.

224.     Yosemite National Park is a famous mark owned by the NPS.  Yosemite National Park is widely recognized by the general consuming public of the United States as a designation of source of the NPS's goods and services.  When the general public encounters the mark in almost any context, it associates the term, at least initially, with the NPS.

225.     Yosemite National Park is a distinctive mark.

226.     DNCY's use of YOSEMITE NATIONAL PARK in commerce has diluted the NPS's "Yosemite National Park."

227.     DNCY first began using YOSEMITE NATIONAL PARK in commerce after the NPS's "Yosemite National Park" became famous.

228.     DNCY's use of YOSEMITE NATIONAL PARK has caused and is further likely to cause dilution by blurring because the association that arises from the similarity between DNCY's mark and NPS's mark impairs the distinctiveness of NPS's mark.

229.    DNCY's use of YOSEMITE NATIONAL PARK has caused and is further likely to cause dilution by tarnishment because the association that arises from the similarity between DNCY's mark and NPS's mark harms the reputation of NPS's mark.

230.    Accordingly, YOSEMITE NATIONAL PARK, Registration No. 2715307, should be cancelled.

231.    Plaintiff's Yosemite-related trademarks are invalid and/or unenforceable for the reasons set forth above.

232.    Even assuming for the sake of argument that Section 13(b)(1) of DNCY's concession contract is interpreted as obliging NPS to require a successor concessioner to DNCY's intangible property, it is unenforceable because a party cannot be required to pay for intangible property that is not valid or enforceable.

233.    DNCY's breach of contract claims based upon its alleged Yosemite-related trademarks discussed above fail to state a relief upon which relief can be granted because those trademarks are invalid and/or unenforceable.

WHEREFORE, defendant requests that the Court enter judgment in its favor, order that the complaint be dismissed, and grant defendant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

 /s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

Of Counsel:
SCOTT BOLDEN
Department of Justice

IGOR HELMAN
MARGARET J. JANTZEN
Trial Attorneys
Commercial Litigation Branch


Dated:  March 23, 2018

/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-7972
Fax: (202) 514-8640
email:  John.Roberson@usdoj.gov